J-S37008-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.D.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: LUZERNE COUNTY CHILDREN AND YOUTH SERVICES | : | |
| | : | |
| | : | |
| | : | No. 143 MDA 2017 |

Appeal from the Order Entered December 15, 2016
In the Court of Common Pleas of Luzerne County
Orphans' Court at No:  Adoption No. A-8401

| | | |
|---|---|---|
| IN THE INTEREST OF: K.J.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: LUZERNE COUNTY CHILDREN AND YOUTH SERVICES | : | |
| | : | |
| | : | |
| | : | No. 156 MDA 2017 |

Appeal from the Order Entered December 15, 2016
In the Court of Common Pleas of Luzerne County
Orphans' Court at No:  A-8400

BEFORE:   STABILE, MOULTON, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                **FILED NOVEMBER 14, 2017**

Appellant, Luzerne County Children and Youth Services ("CYS"), appeals from the December 15, 2016 orders denying its petitions for the involuntary termination of the parental rights of C.B. ("Mother") and J.C. ("Father") with respect to their sons, N.D.C., born in May of 2015, and

K.J.C., born in March of 2013 (collectively, "the Children").[1]  Upon careful review, we affirm.[2]

We summarize the relevant facts and procedural history as follows.  In December of 2013, CYS became involved with this family, at which time Mother was in the eleventh grade and residing in her grandmother's home, along with K.J.C., who was approximately eight months old.  N.T., 6/16/16, at 146-147.  The record does not reveal whether Father resided with Mother and K.J.C. at that time.  CYS received a report alleging that the nine-year-old sibling of Mother was the victim of abuse in the grandmother's home, the

_____

[1] Importantly, we observe that the docket entries in the Court of Common Pleas of Luzerne County do not comply with the rules regarding entry of orders.  **See** Pa.R.A.P. 301(a)(1); Pa.R.A.P. 108(b); Pa.R.C.P. 236(b).  We caution the Luzerne County Court of Common Pleas to comply with the relevant rules for entry of orders so that appeal periods are triggered.  **See Frazier v. City of Philadelphia**, 735 A.2d 113, 115 (Pa. 1999) (citations omitted) ("Thus, pursuant to the express terms of the rules, an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given").

Because the subject orders were not entered on the trial court docket, the appeal period in this case was never formally triggered.  It would be, at this juncture, a waste of judicial resources to remand the matter solely for the filing of Rule 236(b) notice.  Accordingly, in the interest of judicial economy, we will regard as done what should have been done and address these appeals on the merits.

[2] The Guardian Ad Litem has filed a brief in support of the orders denying the involuntary termination petitions.

details of which are unspecified in the record.[3] Trial Court Opinion, 2/17/17, at 3; N.T., 6/16/16, at 10. Upon investigation, CYS visited the residence and found K.J.C. in the home, but Mother and Father were not present. N.T., 6/16/16, at 10. Further, CYS found that Mother had left her grandmother a note stating that she was leaving the house and not returning. *Id.*

On December 6, 2013, the court placed K.J.C. in shelter care. *Id.* On January 10, 2014, the court adjudicated him dependent. CYS placed K.J.C. in kinship foster care with his maternal great-aunt and her husband, who live in Langhorne, Bucks County, Pennsylvania.[4] *Id.* at 109-110.

CYS established K.J.C.'s placement goal as reunification. N.T., 6/16/16, at 11, 94. Mother and Father were required to satisfy Family Service Plan ("FSP") objectives to participate in a drug and alcohol evaluation, to participate in parenting services and mental health services, and to obtain safe and stable housing. Trial Court Opinion, 2/17/17, at 4; N.T., 6/16/16, at 11-12, 16.

By the time N.D.C. was born, K.J.C. had been in placement for approximately seventeen months. The court placed N.D.C. in shelter care

---

[3] To the extent the orphans' court found that Father was accused of abusing Mother's sibling, there is no evidence in the certified record to support this finding.

[4] CYS did not approve Mother's grandmother as a kinship care resource. N.T., 6/16/16, at 106.

the day after his birth in May of 2015. N.T., 6/16/16, at 10. On June 24, 2015, the court adjudicated him dependent. *Id.* at 94. N.D.C. has resided in the kinship foster home with K.J.C. since September of 2015. *Id.* at 109-110.

Likewise, CYS established N.D.C.'s placement goal as reunification. N.T., 6/16/16, at 11, 94. Importantly, Mother's and Father's FSP objectives remained the same. *Id.* at 12.

Throughout the Children's dependencies, Mother and Father were granted supervised visitation with the Children. At the time of K.J.C.'s placement, they were granted visitation for two hours every Friday at the CYS office and every Saturday at the maternal grandmother's home for three and one-half hours. N.T., 6/16/16, at 99. In August of 2014, their supervised visitation was increased to three hours every Friday at the CYS office. *Id.* at 99-100. In December of 2014, Mother and Father were granted supervised visitation for two and one-half hours every Thursday and Friday at the CYS office, and on alternating Saturdays at a shopping mall in Langhorne, Pennsylvania, to be supervised by the kinship care parents. *Id.* at 100. By the time the subject proceedings, Mother and Father were granted supervised visitation in Langhorne, Pennsylvania, every Saturday from 11:00 a.m. to 4:00 p.m., and no supervised visits at the CYS office. *Id.* at 101, 103.

On March 16, 2016, CYS filed petitions for the involuntary termination of Mother's and Father's parental rights to K.J.C. pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b).  On the same date, CYS filed petitions related to N.D.C., at which time he had been in placement for approximately ten months, wherein it requested the involuntary termination of Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (b).

On June 16, 2016, a hearing on the petitions occurred.[5]  CYS presented the testimony of its caseworker, Lynn Lesh; Lenora Hermann-Finn, Ph.D., clinical psychologist; Marisue Sack and Paul Dorang, case managers at Family Service Association; Grace Tavaris, the case manager of intensive family reunification services at Family Service Association; Raina Cole, director of intake services at Northeast Counseling; and Alicia Singer, senior clinician at Community Counseling Services.  Mother and Father testified on their own behalf.

By orders dated December 15, 2016, the orphans' court denied the petitions for the involuntary termination of Mother's and Father's parental

---

[5] The record supports the orphans' court's finding that CYS "withdrew the allegation of unresolved drug and alcohol issue[s] as one of the reasons for terminating Father's parental rights" at the beginning of the termination hearing.  Trial Court Opinion, 2/17/17, at 4; N.T., 6/16/16, at 7. Importantly, drug and alcohol abuse was not of concern to CYS in the underlying matter with respect to either Mother or Father.  *Id.*; N.T., 6/16/16, at 105.

rights. On January 17, 2017, CYS timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The orphans' court filed its Rule 1925(a) opinion on February 17, 2017.

On appeal, CYS presents the following issues for our review:

[1.] Whether the [orphans'] [c]ourt abused its discretion/erred in not terminating the parental rights of the biological parents of K.[J.]C. as the grounds pursuant to [23] Pa.C.S. § 2511(a)(2), (5) and (8) were established by clear and convincing evidence and such denial of the petition[s] to terminate parental rights was against the weight of the evidence presented by [CYS] to support the terminations[?]

[2.] Whether the [orphans'] [c]ourt abused its discretion/erred in not terminating the parental rights of the biological parents of [N.D.]C. as the grounds pursuant to [23] Pa.C.S. § 2511(a)(2) and (5) were established by clear and convincing evidence and such denial of the petition[s] to terminate parental rights was against the weight of the evidence presented by [CYS] to support the terminations[?]

CYS' brief at 2-3.

In this appeal, we apply the following standard of review:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371, 34 A.3d 1, 51 (Pa. 2011);

- 6 -

*Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 7 -

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511).

"In termination cases, the burden is upon [the petitioner] to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

Instantly, in denying the involuntary termination petitions, the orphans' court concluded that CYS did not prove by clear and convincing evidence that Mother's and Father's conduct warranted termination under Section 2511(a)(2), (5), or (8), which provide as follows.[6]

_____

[6] Pursuant to the requisite bifurcated analysis, the orphans' court did not analyze Section 2511(b), which provides:

> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

*(Footnote Continued Next Page)*

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

*(Footnote Continued)* ————————————

23 Pa.C.S. § 2511(b); ***see also In re L.M.***, ***supra***.

23 Pa.C.S. § 2511(a)(2), (5), (8).

In ***In re Adoption of M.E.P.***, 825 A.2d 1266 (Pa. Super. 2003), this Court stated, as follows.

> In order to terminate parental rights pursuant to [Section] 2511(a)(2), the following three elements must be met (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.
>
> . . .
>
> In order for termination pursuant to [Section] 2511(a)(5) to be proper, the following factors must be demonstrated (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.
>
> . . .
>
> In order to terminate parental rights pursuant to [Section] 2511(a)(8), the following factors must be demonstrated (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; (3) termination of parental rights would best serve the needs and welfare of the child.

***Id.*** at 1272-1276 (citations omitted).

With respect to Section 2511(a)(8), we further explained, "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of CYS supplied over a realistic time-period. *Id.* The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009).

On appeal, CYS asserts that, in deciding not to terminate Mother's and Father's parental rights to the Children, the orphans' court "failed to give weight [to evidence] that [Mother and Father] failed to remedy the circumstances that led to placement in a reasonable time and instead focused solely on environmental factors as the reason for continued placement." CYS' brief at 12. Specifically, CYS argues the record demonstrates Mother and Father failed to complete their FSP objectives including two parenting courses, a comprehensive family assessment, mental health evaluations, and to follow all mental health recommendations. Further, CYS argues the record demonstrates Mother and Father failed to complete their FSP objectives to maintain consistent contact with the

Children and safe and stable housing. As such, CYS argues Mother and Father failed to remedy the conditions that led to the Children's placement. Upon review, we discern no abuse of discretion.

In its Rule 1925(a) opinion, the orphans' court first explained its conclusion that CYS did not satisfy its burden of proof under Section 2511(a)(8) with respect to Mother's and Father's parental rights to K.J.C. Specifically, the court found that CYS did not prove the second factor, that the conditions which led to the child's placement continue to exist with Mother and Father. Further, the court found that CYS did not prove "that there is little rational prospect of timely reunification" of Mother and Father with him. Trial Court Opinion, 2/17/17, at 16. The court incorporated its findings related to Section 2511(a)(8) in its analysis of Section 2511(a)(2) and (5), and likewise concluded that CYS failed in its statutory burden to terminate Mother's and Father's parental rights to both K.J.C. and N.D.C.

Regarding their parenting services objective, the court emphasized the testimony of Paul Dorang, the case manager at Family Service Association, who worked with Mother and Father on their parenting skills from January to April of 2015, when K.J.C. was two years old, and Mother was pregnant with N.D.C. N.T., 6/16/16, at 43. Mr. Dorang testified that they successfully completed the parenting program. *Id.* In fact, Mr. Dorang testified, "[a]s far as looking at their interactions and their ability to care for their son, we saw that there was no -- there were no issues. There were no concerns. . .

. They both initiated play [with K.J.C.]. They both expressed love. They both reinforced each other for boundaries because [K.J.C.] was doing some things. . . ." *Id.* at 44.

With respect to their mental health objectives, the court emphasized the testimony of Raina Cole, the director of intake services at Northeast Counseling. Ms. Cole testified that Father obtained a psychiatric evaluation at Northeast Counseling in March of 2014, which did not result in a recommendation for outpatient mental health services. *Id.* at 65, 78. Indeed, Ms. Cole testified that the evaluation revealed Father had "no psychiatric issues" and "didn't need any medications or therapy." . . . Trial Court Opinion, 2/17/17, at 5-6 (*citing* N.T., 6/16/16, at 75-76).

Likewise, Mother obtained a psychiatric evaluation at Northeast Counseling in 2014. During the hearing, it was disputed whether the evaluation resulted in Mother being required to participate in outpatient mental health services. The court explained as follows, which the testimonial evidence supports.

> Ms. Cole was asked to read the treatment recommendation on cross-examination[,] which stated as follows: "medically necessary to refer to SCAN, which stands for Services for Children and Youth, and to learn anger management skills and self-control. Follow-up is (sic) needed." [Trial Court Opinion, 2/17/17,] at 67. On cross-examination[,] Ms. Cole testified that Mother would have left with a follow-up [appointment] to SCAN; however, Ms. Cole was not able to confirm that the follow-up [appointment] was made. Ms. Cole did not provide any documentation substantiating that a referral to SCAN was ever made. *Id.* Upon cross-examination, Ms. Cole testified that the psychiatrist and the patient determines whether a follow-up is

- 13 -

needed for further treatment. Ms. Cole was not aware if either the psychiatrist or the therapist ever made a follow-up request. *Id.* at 69.

Mother testified that the doctor advised her to continue treatment as needed[,] and she believed that meant "if she needed it." Mother testified that she was never contacted regarding a program called SCAN, nor was she ever informed that she had missed any scheduled appointments with respect to that program. *Id.* at 154.

Trial Court Opinion, 2/17/17, at 6-7. Therefore, the court made a credibility determination in favor of Mother and against Ms. Cole with respect to whether Mother was required to participate in outpatient mental health services at SCAN.

In addition, in the summer 2014, Lenora Hermann-Finn, Ph.D., a clinical psychologist, performed a psychological evaluation of Mother and Father. N.T., 6/16/16, at 20-21. With respect to Father, the orphans' court aptly set forth Dr. Hermann-Finn's testimony as follows.

Dr. Finn testified that Father grew up in a household with an alcoholic and drug addicted [m]other who would leave him alone at home and go to a bar. Father was also left alone to raise his younger siblings. Dr. Finn further testified that Father related to her that he was physically and sexually abused by [his] [m]other's boyfriends. Father was also physically abused by his adoptive parents. [N.T., 6/16/16,] at 26-27. Dr. Finn recommended trauma counseling for . . . Father. The [c]ourt notes that Dr. Finn does not reference in her testimony whether Father ever received any type of counseling in his childhood. The [c]ourt believes that Father did not provide that history to Dr. Finn.

Father testified that from the time he was 10 years old until 12 years old, he received victims' counseling once per week or at times twice per week. Father testified that since that time until

the present, he did not have any significant problems in his daily life relating to problems he had as a child. *Id.* at 183-184.

The [c]ourt finds that Father had received trauma counseling for two years in his childhood and there was no new evidence presented to Dr. Finn to suggest that he needed to reengage for past trauma for which he already received treatment. As stated above, based on Dr. Finn's testimony, it does not appear that Dr. Finn was aware that Father had already received trauma counseling between the ages of 10 and 12. Furthermore, the evaluation report of Father [performed by Northeast Counseling], indicated that there is no need for any further mental health treatment.

Trial Court Opinion, 2/17/17, at 7-8. As such, in determining that Father did not need further mental health treatment, the orphans' court made credibility findings in favor of Father and against Dr. Hermann-Finn.

With respect to Mother, Dr. Hermann-Finn diagnosed Mother with borderline cognitive ability, and that she was a social introvert with depressive disorder. Trial Court Opinion, 2/17/17, 6. Dr. Hermann-Finn recommended that Mother continue in counseling.[7] N.T., 6/16/16, at 24. In addition, she recommended that Mother satisfactorily complete the parenting education program with Father at Family Service Association, which, as discussed above, Mother ultimately completed in April of 2015. *Id.* at 21, 23.

---

[7] Dr. Hermann-Finn testified, "When I saw [Mother,] she had been for one session with a counselor." N.T., 6/16/16, at 24. The record does not specify any details about the counselor whom Mother had seen at that time.

Based on the foregoing, the orphans' court found that CYS did not prove by clear and convincing evidence that the conditions which led to the placement of K.[J.]C., namely parenting and mental health issues, continued to exist as to Mother and Father. In essence, the court determined that the conditions did not exist at the time of N.D.C.'s birth in May of 2015. Nevertheless, N.D.C. was placed, and CYS referred Mother and Father to the intensive family reunification ("IFR") services at the Family Service Association. Ms. Lesh testified that the purpose of the referral was to "go[] over caring for two children, [and] developmental stages of a newborn versus a toddler. [Mother] did not have any prenatal care with [N.D.C.], so we wanted . . . to make sure that [they] would know developmental things [with N.D.C.] to look for if there [were] any that might come up." N.T., 6/16/16, at 116. The court concluded that the additional parenting program was unnecessary and/or unwarranted, as follows.

> [CYS] had referred the parents to another parenting program in May 2015, despite the fact that there was no new evidence of any allegations made regarding parenting concerns within that month. Ms. Lesh, a caseworker for [CYS], testified the referral was made due to the birth of N.[D.]C. and also because Mother did not receive prenatal care during the pregnancy. [N.T., 6/16/16,] at 116-117. Despite the fact that Mother did not receive prenatal care during her pregnancy, N.[D.]C. was born a healthy child. The [c]ourt further notes that while it is certainly not condoned by this [c]ourt, there is no law which requires Mother to receive prenatal care during her pregnancy.

Trial Court Opinion, 2/17/17, at 12. The testimonial evidence supports the court's findings.

- 16 -

With respect to Mother's and Father's housing objective, Ms. Lesh testified that, in May of 2015, when she became involved in the case, they were being evicted from the home they rented. N.T., 6/16/16, at 126. The orphans' court disagreed and explained their housing circumstances as follows.

> Mother and Father . . . had appropriate housing from August 14, 2014 to August 15, 2015. [N.T., 6/16/16,] at 193-194. Mother testified that she was advised by the caseworker from [CYS] that a banister was needed for the residence. Mother testified that she purchased a banister and advised [CYS] of the same. Mother testified that [CYS] made a few appointments for a visit to the home; however, [CYS] never showed up at the residence. The natural parents resided there for one year without [CYS] ever coming to inspect the property. The landlord sold the property and the parents were required to move out. [Mother and Father] were never evicted from the residence. According to Mother, she and Father found a residence but only resided there for two to three months. Subsequently, they resided with friends were approximately one month until they secured a residence with . . . [M]other's aunt.[8] Mother testified that she [notified CYS] of her new residence with her aunt. Mother testified that there is also adequate room for her children to reside with them. [N.T., 6/16/16,] at 148-152.

Trial Court Opinion, 2/17/17, at 9-10. As such, by the time of the subject proceedings, the court found that Mother and Father had appropriate housing. To the extent that they were unable to find appropriate housing from August of 2015, until February of 2016, the court found that it was

_____

[8] Ms. Lesh testified that Mother and Father began residing at their current residence in February of 2016, which was approximately one month before the filing of the involuntary termination petitions. N.T., 6/16/16, at 98.

- 17 -

beyond their control, due to their poverty, and that poverty is not a reason to terminate their parental rights. *Id.* at 11.

Likewise, the orphans' court found that it was beyond their control to maintain consistent supervised visits with K.J.C. and N.D.C. The record reveals that Mother and Father became inconsistent with attending their visits at the CYS office in 2015. N.T., 6/16/16, at 98-99. In total, they attended 72 out of a possible 138 supervised visits at the CYS office. *Id.* at 100-101. However, the orphans' court found as follows.

> [Mother and Father] . . . faced hurdles with visiting their children in terms of transportation. [They] did not own a vehicle. Originally[,] the visits with the minor children occurred at the office of [CYS]. Then the children were placed in Langhorne, Pennsylvania, which according to Father was a three[-]hour trip since back roads were taken at the choice of the person transporting. Further, Father testified that many times the rides were canceled and that he and Mother had no means of transportation and were not able to see their children. [N.T., 6/16/16,] at 191. The Guardian Ad Litem indicated as follows in her recommendation:
>
>> At this time, there seems to be major impediments to visiting their children, such as the overall geographic distance, ability to travel in the cost of travel, the inability to call or send items to their children, and the ability to visit with their children in an environment conducive to interaction and fun, considering K.[J.]C. and N.[D.]C.'s young ages.
>
> (Report of Guardian Ad Litem)

Trial Court Opinion, 2/17/17, at 10. The testimonial evidence supports the court's findings. In addition, although CYS provided bus passes to Mother

- 18 -

and Father so that they could attend their supervised visitation, Ms. Lesh testified on cross-examination by Mother's counsel as follows.

Q. . . . Did [Mother and Father] ever live in an area or reside in an area where there was no bus transportation?

A. They actually live in Hometown right now. And they had reported to me that there was no bus transportation.

Q. Are you able to verify that there is no bus transportation in Hometown?

A. I did verify that. . . .

N.T., 6/16/16, at 124-125.

For the foregoing reasons, the orphans' court concluded that CYS failed to prove by clear and convincing evidence that Mother's and Father's conduct warranted termination under Section 2511(a)(2), (5), and (8). The court found that Mother and Father remedied the conditions that led to the placement of the older child, K.J.C., *i.e.*, parenting and mental health issues, by the time of N.D.C.'s birth. Further, the court found that the additional parenting program required of Mother and Father after N.D.C.'s birth was unnecessary and/or unwarranted. By the time of the filing of the involuntary termination petitions and the hearing, the court found that Mother and Father had suitable housing, and that there was no evidence that they could not be timely reunified with K.J.C. and N.D.C. Finally, the court agreed with the Guardian Ad Litem that the children residing in Langhorne, Bucks County, with the kinship care parents, was a major impediment to Mother and Father being able to visit them on a consistent basis.

Upon thorough review, we conclude that the certified record supports the factual findings and credibility determinations of the orphans' court. Further, we discern no error of law or abuse of discretion. Accordingly, we affirm the orders denying the petitions for the involuntary termination of Mother's and Father's parental rights to K.J.C. and N.D.C.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/14/2017